UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOHN H. ROSKY,

                     Petitioner,

    v.

QUENTIN BYRNE, *et al.*,

                    Respondents.

Case No. 3:16-cv-00156-MMD-VPC

ORDER

       This *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 comes before the Court on respondents' motion to dismiss on several grounds, including timeliness. (ECF No. 16.) Petitioner John Rosky ("Rosky") has opposed. (ECF No. 28.) On January 19, 2018, the Court directed respondents to respond to Rosky's claim that his petition is timely under the actual innocence exception of *Schlup v. Delo*, 513 U.S. 298 (1995) ("gateway claim of actual innocence"). (ECF No. 42.) The Court further ordered Rosky to provide a copy of an audio recording he relies on for his gateway claim of actual innocence, along with any and all evidence authenticating the recording. (*Id.*) Respondents and Rosky have responded to the Court's order. (ECF Nos. 49 & 51.) In addition, following an order of the Court, respondents have filed the subject audio recordings as manual exhibits. (*See* ECF Nos. 52, 53, 54.)

## I.    BACKGROUND

       Rosky challenges his state court convictions for indecent exposure and sexual assault. (Exhs. 75, 80, 161, 163.) Rosky was initially found guilty on both counts following a jury trial in 2003, but on appeal the Nevada Supreme Court reversed the

sexual assault conviction and remanded for a new trial. (*See* Exhs. 77, 80, 128.) Rosky's second trial commenced on March 27, 2006. At trial, the following evidence was presented.

The victim, C.J., met Rosky during a snowball fight in their apartment complex, and they became friends. (Exh. 155 (Tr. 48).) C.J. began spending time at Rosky's apartment, watching T.V. or playing on the computer. (*Id.* at 48-49.) Rosky would often give her gifts, such as cash and C.D.s, or take her out to eat. (*Id.* at 49.) Sometimes, they would wrestle, and when Rosky pinned C.J. down she would jokingly yell "rape," which caused Rosky to immediately stop. (Exh. 156 (Tr. 64-65 & 93).) C.J. came home after one of these wrestling sessions and told her grandmother about it; her grandmother could tell by the tone of her voice or the way she said it that she was uncomfortable. (Exh. 155 (Tr. 149).)

Once, Rosky and C.J. drove together from Reno to Susanville to get a dog — a dog that Rosky told C.J. was hers and for her to take care of. (*Id.* at 52.) C.J. and Rosky spent a great deal of time together, including writing each other emails, talking on the phone, and walking the dog. (*Id.* at 62-63.) C.J. also had a key to Rosky's apartment. (Exh. 155 (Tr. 157-58).) C.J. went over to Rosky's apartment frequently in the year before the assault, and by December 1999 was going up to five times a week. (*Id.* at 62.) C.J. was, at the time, 13 years old. (*See* Exh. 155 (Tr. 140).)

C.J.'s friend, Brittany Middleton, testified that Rosky bought C.J. things and that C.J. would go to Rosky's apartment "all the time," including at night and almost every day in the month leading up to the assault. (Exh. 155 (Tr. 170-72 & 182).) Middleton also testified that C.J. was very attached to the dog Rosky got for her. (*Id.* at 175.) Middleton sometimes observed Rosky walking the dog by C.J.'s apartment and looking into her windows or patio. (*Id.* at 177.) She also testified that Rosky always threatened to get rid of the dog, and that that was one of the reasons C.J. would go over to Rosky's apartment. (*Id.* at 174.) Middleton testified that toward the end of December 1999, Rosky started getting "real pushy towards CJ and it seemed like more controlling." (*Id.*)

2

C.J. testified that the night of the assault, which occurred at the end of December 1999, she and her friends had been drinking at Rosky's apartment as part of a New Year's Eve celebration. (Exh. 156 (Tr. 70-72).) She did not remember how much she had to drink, but it was more than usual and she felt dizzy, out of sorts, and not in control of all her senses. (*Id.* at 53-54.) When her friends left for another party, C.J. stayed behind. (*Id.* at 71-72.) Then, she testified, she and Rosky went into the bedroom, where he forced her to have sex. (*Id.* at 53-56 & 72.) Rosky did not forcibly take C.J. into the bedroom or threaten her; she voluntarily walked into the room. (*Id.* at 72-73). And she did not fight against Rosky or say anything, including "no," "stop," or "rape." (*Id.* at 54-55 & 75-76.) That, C.J. testified, was because she was "really drunk and . . . didn't know what to do." (*Id.* at 55.) Afterwards, C.J. went home, feeling "all out of sorts" and "really violated." (*Id.* at 56.)

C.J. did not immediately tell anyone about the assault and in fact continued going over to Rosky's house after it happened. (Exh. 156 (Tr. 79). She testified that she did not tell anyone about the incident because she was embarrassed. (*Id.*) Her grandmother also testified that C.J. felt ashamed and guilty and "totally block[ed]" the incident "out." (Exh. 155 (Tr. 163-64).) C.J. testified that she continued going over to Rosky's house both because she was afraid of him and because he gave her things. (Exh. 156 (Tr. 90-94).) Specifically, C.J. testified she thought Rosky might hurt her, their dog, or her boyfriend if she told anyone about the assault or if she stopped coming over. (*Id.* at 90-91.)

Sometime in January 2000, C.J. told Middleton what had happened; Middleton then told her father, who contacted the police.[1] (Exh. 155 (Tr. 185).)

Officer Michael Tone interviewed C.J. on February 2, 2000, at which time she denied the assault or any sexual contact with Rosky at all. (Exh. 155 (Tr. 57, 80-81 & 113).) C.J. told Tone that one time, at the end of December 1999, she and her friends

[1]Although police officers responded and spoke to C.J. and Middleton on January 25, 2000, that event was not discussed at trial. (*See* Exh. 219 at 9-13.)

had been partying at Rosky's; she stated that she had not been drinking, that Rosky was grossly intoxicated, and that everyone left after Rosky passed out. (Exh. 156 (Tr. 117-18).)

Around February 8, 2000, C.J. called the police to report that she thought Rosky was having sex because she heard him through the wall of his apartment. (*Id.* at 81-82 & 120.) Afterwards, she went over to Rosky's apartment and scratched something on his door. (*Id.*)

Sometime after Tone's first interview with C.J., C.J.'s grandmother brought Tone emails she had found that were between Rosky and C.J. (*Id.* at 10.) Some of the emails were forwarded from Rosky to C.J. of emails between Rosky and a woman named "Gina Newby," who C.J. believed was a "really close" friend of Rosky's. (Exh. 156 (Tr. 95, 103.) The content of the emails regarded Rosky and C.J.'s relationship and things that had happened between them, including drinking, C.J. coming over at night, and Rosky researching why C.J. had missed her menstrual cycle. (*Id.* at 104.) "Gina" would respond by saying things like, "I'm really glad that you two are together, you seem to really care a lot about each other. . . . I know that [C.J]'s got you wrapped around her finger. . ." (*Id.*) Another email from Rosky to C.J., dated February 10, 2000, laid out a number of rules, including that C.J. was limited to four alcoholic drinks in a night if she had to be up early the next day, and that on school nights she had to be home by 1 a.m. (Exh. 156 (Tr. 12-13).)

Sometime before February 15, 2000, C.J. called a woman named Gina Newby, who she believed to be the "Gina" from Rosky's emails; C.J. attempted to speak to her about the emails, but Newby didn't seem to know what she was talking about and C.J. thought she was "playing dumb." (*Id.* at 97-98.) Newby later filed a police report against Rosky asserting that he was sending emails to C.J., and the case was assigned to Officer Tone. (Exh. 156 (Tr. 100).) Tone realized that the Newby case and this case were related and that Rosky had manufactured the emails between himself and "Gina" that he had sent to C.J. (*Id.* at 100-03.)

On February 16, 2000, Tone again interviewed C.J. Again, C.J. denied the assault. However, after Tone revealed to C.J. that email "Gina" was Rosky himself, C.J. told Tone about the assault. (Exh. 156 (Tr. 95-96 & 129-31).)

Tone and Detective Thomas Reid interviewed Rosky. (*See* Exh. 156 (Tr. 23).) At least part of the interview was played for the jury, and Reid and Tone also testified as to what Rosky told them. (*See* Exh. 155 (Tr. 197-200); Exh. 156 (Tr. 24-31).) During the interview, Rosky initially denied even being friends with C.J. and changed his story several times before finally admitting that he'd had sexual intercourse with C.J. (Exh. 155 (Tr. 198-200); Exh. 156 (Tr. 24-31).)

On March 29, 2006, the jury found Rosky guilty of sexual assault. (Exh. 161.) Rosky was sentenced to a term of life imprisonment with eligibility for parole after twenty years, to run concurrent with his twelve-month sentence on the indecent exposure conviction. (Exh. 163.)

Rosky appealed. (Exh. 167.) The Nevada Supreme Court affirmed. (Exh. 183). Remittitur, which initially issued on March 11, 2008, was recalled and stayed pending consideration of Rosky's motion for rehearing *en banc.* (Exhs. 186, 189.) On July 7, 2008, the Nevada Supreme Court denied the motion for rehearing, and on August 1, 2008, remittitur issued. (Exhs. 194,197.)

Before his direct appeal became final, Rosky filed a petition for postconviction relief in state court. (Exh. 188.) The district court denied relief, and Rosky appealed. (Exhs. 260, 262.) The Nevada Supreme Court affirmed, and remittitur issued on July 8, 2013. (Exhs. 290, 292.)

On September 4, 2013, Rosky dispatched a federal petition for writ of habeas corpus to this court, commencing Case Number 2:13-CV-01707-JCM-PAL. The petition asserted a single double jeopardy claim. (ECF Nos. 1, 9 in Case No. 2:13-CV-01707-JCM-PAL.) On initial review, the court ordered Rosky to show cause why the petition should not be dismissed as completely unexhausted. (ECF No. 8 in Case No. 2:13-CV-01707-JCM-PAL.) As Rosky's response conceded that the single claim presented was

not exhausted, the court dismissed the petition. (ECF Nos. 10, 12 in Case No. 2:13-CV-01707-JCM-PAL.) Rosky appealed, and the Ninth Circuit denied a certificate of appealability. (ECF Nos. 14 & 16 in Case No. 2:13-CV-01707-JCM-PAL.)

On November 21, 2014, Rosky filed a second postconviction habeas petition in state court. (Exh. 293.) After the district court dismissed the petition as procedurally barred and the Nevada Court of Appeals affirmed, Rosky filed the instant federal habeas petition. (Exhs. 310, 322; ECF No. 2.) Rosky dispatched the petition in this case on March 7, 2016.

Respondents move to dismiss the instant petition on several grounds, including that it was filed after the expiration of the one-year statute of limitations for petitions filed pursuant to 28 U.S.C. § 2254.

## II.    TIMELINESS

The one-year limitation period for § 2254 petitions begins to run after the date on which the judgment challenged became final by the conclusion of direct review or the expiration of the time for seeking such direct review, unless it is otherwise tolled or subject to delayed accrual.[2] 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while "a properly filed application for State post-conviction or other collateral review" is pending. *Id.* § 2244(d)(2). Petitions can also be subject to equitable tolling in some circumstances. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). Neither a properly filed federal habeas petition nor an untimely state habeas petition tolls the limitations period, however. *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005) (holding that an untimely state habeas petition is not "properly filed" and thus does not toll the limitation period); *Duncan v. Walker*, 533 U.S. 167, 172 (2001) (holding that "a properly filed federal habeas petition does not toll the limitation period").

///

---

[2] The statute of limitations may also begin to run from other events, including "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D), but Rosky does not claim that any of those provisions apply in his case.

6

Because Rosky filed a timely petition for state postconviction habeas relief before his conviction became final, the limitations period in this case did not begin to run until July 8, 2013 — the date remittitur issued on the appeal of the denial of the petition. Absent a basis for either delayed accrual or other tolling, the federal limitation period thus expired on July 8, 2014. Rosky's petition in this case, dispatched for filing on March 7, 2016, is thus apparently untimely.

Neither Rosky's first federal petition nor his second, untimely, state postconviction petition tolled the limitations period. *Duncan*, 533 U.S. at 172; *Pace*, 544 U.S. at 413. Rosky asserts that his petition may be considered timely pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995) because he is actually innocent or, in the alternative, that he is entitled to equitable tolling.

### A. Actual Innocence

Demonstrating actual innocence is a narrow "gateway" through which a petitioner can obtain federal court consideration of habeas claims that are otherwise procedurally barred, including claims filed after the expiration of the federal limitations period. *Schlup*, 513 U.S. at 314-15; *Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc) (A "credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the *Schlup* gateway and have his otherwise time-barred claims heard on the merits."); *see also McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency. *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). "[T]enable actual-innocence gateway pleas are rare.'" *McQuiggen*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met). To satisfy the narrow *Schlup* standard, a petitioner must come forward with new, reliable evidence that was not presented at trial that, together with the evidence adduced at trial, demonstrates that it is more likely than not that no reasonable ///

juror would have found the petitioner guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329.

The evidence need not be newly discovered, but it must be "newly presented." *See Griffin v. Johnson*, 350 F.3d 956, 961–63 (9th Cir. 2003). A "petitioner may pass through the *Schlup* gateway by promulgating evidence that significantly undermines or impeaches the credibility of witnesses presented at trial, if all the evidence, including new evidence, makes it 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002).

In support of his gateway claim of actual innocence, Rosky invokes Grounds Five through Ten of his petition. (ECF No. 28 at 4; ECF No. 2 at 80-99.) As an initial matter, Grounds Five and Ten are legal arguments, not evidence. Accordingly, Grounds Five and Ten do not provide a basis for passing through the *Schlup* gateway.

In Ground Six, Rosky asserts that an audio tape recording of a conversation between himself and C.J., recorded on January 26, 2000 — after the assault — undermines C.J.'s credibility by showing she: (1) was in a consensual intimate relationship with Rosky, possessed intimate knowledge of his anatomy and "desired to perform fellatio" on him; (2) was not embarrassed to talk about sex and possessed knowledge of sex beyond her years; and (3) was not behaving as one who had just been assaulted by Rosky one month prior and in fact was comfortable with Rosky. (ECF No. 2 at 84-87.) Respondents argue that this evidence is not new or reliable but that even if it were it does not show Rosky is actually innocent.

The Court will assume without deciding that the audiotape constitutes new, reliable evidence.[3] Because even assuming the evidence is new and reliable, the Court

_____

[3] The audio recording is at least arguably new evidence, as it was not presented to the jury during trial. *See Griffin v. Johnson*, 350 F.3d 956, 962-63 (9th Cir. 2003). Whether it is reliable is a more difficult issue but not one the Court need resolve. As discussed, even assuming the evidence is new and reliable, it does not demonstrate Rosky's innocence or significantly undermine the credibility of any witnesses, including C.J.

is not persuaded that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" had the recording been played at trial.

The audio recordings were filed manually as Exhibits 324 and 325.[4] (*See* ECF No. 53.) On the recordings, the following conversation takes place:

| | |
|---|---|
| Rosky: | Okay. |
| C.J.: | I love your wiggly biceps. |
| Rosky: | You love what? |
| C.J.: | I love your wiggly biceps. |
| Rosky: | Yeah, I like 'em, too. |
| C.J.: | You have a big, fat long d***. |
| Rosky: | How do you know? |
| C.J.: | Cause I've seen it. |
| Rosky: | You lie like a dog. |
| C.J.: | (Laughing) |
| Rosky: | Why is there laughing here, yo? |
| C.J.: me | Because inside you're a pencil. Oh baby, f*** now, oh. oh. oh. Oh, oh, Jasmin. Oh, Jasmin, oh. |
| Rosky: | The dog? Jasmin, close your ears, please. |
| C.J.: | Jasmin, Jasmin. Hi Jasmin, Jasmin. We're just doing that, I mean, for you. |
| Rosky: | Oh, for me? |
| C.J.: | No, for the dog. Yeah, baby, yeah. |
| Rosky: | I'm laughing too hard. Come on, now. |

---

[4]Exhibits 324 and 325 are substantially identical. Petitioner has also provided a purported transcript. (*See* ECF No. 2-1 at 37-40.) Upon review of the audio recordings, the Court notes that the transcript is basically consistent with the recording, although it does omit some dialogue and ringing sounds. The Court is satisfied for the purposes of deciding this motion that the voices on the recording are Rosky's and C.J.'s. (*See* Exh. 248 (Tr. 147-47 & 166) (two witnesses identifying the voices on the recording as belonging to Rosky and C.J.)

[Ringing][5]

C.J.: Like you are.

Rosky: I can't hear you.

C.J. honey, I'd like to suck you [indiscernible] because it tastes like like you are, sweet and sugar.

Rosky: You guys are at a 976 number.

C.J.: What?[6]

Rosky: A 976 number. You'd make money.[7]

[Ringing][8]

Rosky: Okay, what now?[9]

C.J.: Come over.[10]

Rosky: You want me to come over?

C.J.: Yes.

Rosky: Why?

C.J.: Cause.

Rosky: Cause why?

C.J.: Cause I don't have to answer, but just come over. You'll be happy.

Rosky: No, you're going to treat me like shit. I know you will.

C.J.: No, we won't. No, I won't.

Rosky: Then Brittany will.

C.J.: Well …

Rosky: Well, what?

---

[5]This is not included in the transcript Rosky provided but it is part of the recording.

[6]*See id.*

[7]*See id.*

[8]*See id.*

[9]*See id.*

[10]*See id.*

| C.J.: | Well, Brittany's not even here. |
|---|---|
| Rosky: | Yes, she is there. She's staying the night. I saw her while I was walking the dog, and you two went around the corner. She had a blanket and a pillow. I know she's spending the night. |
| C.J.: | She's not here, seriously. |
| | [Break in recording] |
| | If you come over here, just say yes, and you'll be surprised when you walk in the door. |
| Rosky: | I bet it will be locked. |
| C.J.: | No, trust me, it won't. |

(*See* ECF No. 2-1 (38-40); Exh. 325.)

The recordings do not prove that C.J. was in a consensual sexual relationship with Rosky before, after or at the time of the assault, and in no way prove that she consented to have sex with Rosky on the night in question. Nor is the Court convinced that the recordings would have significantly undermined C.J.'s credibility.

Rosky suggests that C.J.'s ease in discussing sex with him contradicts her explanation for why she initially denied the assault, *i.e.*, that she was embarrassed. However, that C.J. was comfortable speaking sexually to Rosky has no bearing on whether she was comfortable speaking about sex, particularly a sexual *assault*, with the world at large. This is particularly true given that the clear tenor of the recorded conversation was teasing or flirtatious; the impression left is not that C.J. was engaging Rosky in a serious sexual discussion, particularly when C.J.'s age (14 years old at the time) is taken into consideration.

Finally, Rosky argues that the tape shows C.J. was not behaving as one who had just been assaulted by him one month prior and that it shows that she was comfortable with him. However, C.J. testified that she continued to have a relationship with Rosky after the assault because she was "kind of afraid" of him and because he gave her things. C.J.'s behavior is not necessarily inconsistent with having been assaulted a few weeks prior, especially given that C.J. and Rosky had a close relationship that extended

over a lengthy period before that time. Moreover, if C.J. was motivated to keep seeing Rosky because she was afraid of him and she wanted him to give her things, she might also have been motivated to keep their relationship as normal as possible, even if she might have been feeling otherwise. The evidence therefore does not significantly undermine C.J.'s testimony.

In light of all the other evidence presented at trial, the Court cannot conclude that it is more likely than not that *no* reasonable juror would have convicted Rosky if the recordings had been presented at trial. Even considering the audio tape recordings, a reasonable juror could certainly conclude that Rosky assaulted C.J. on December 31, 1999. Petitioner therefore has not established a gateway claim of actual innocence based on the audio recordings.

In Ground Seven, Rosky asserts that a medical report documenting C.J.'s visit with Dr. Holly Rooney on February 10, 2000, demonstrates his innocence because:[11] (1) it indicates C.J. claimed to have had a sexual relationship with a 13-year old boy; (2) it shows C.J. was sexually active, contrary to her statements to detectives, the state nurse (in her subsequent SART (Sexual Assault Response Team) exam) and her grandmother; (3) it shows C.J. was not too embarrassed to inform anyone of the sexual assault because she freely discussed sexual activity and pregnancy with the doctor; (4) it shows C.J. denied sexual contact with Rosky; (5) it shows C.J. and Rosky remained close because he was her "confidant" and they were in an ongoing consensual relationship; (6) it contradicts C.J.'s claim that her only sexual experience was when she was assaulted; (7) it shows C.J.'s grandmother thought Rosky was being investigated for statutory rape, not assault; and (8) it impeaches C.J.'s testimony as she "denies being assaulted a fourth time." (ECF No. 2 at 88-90.)

Assuming that this is new evidence, it does not prove Rosky is actually, factually innocent and does not significantly undermine C.J.'s credibility. First, that C.J. told her

///

---

[11]The medical report is attached to the petition. (ECF No. 2-1 at 36.)

doctor she was in a sexual relationship with a 13-year-old boy and denied having sexual contact with Rosky does not prove that either of those statements is true. C.J. went to the doctor for a pregnancy test and thus may have felt a need to explain who might have gotten her pregnant. A reasonable juror could conclude C.J. was deflecting in order to cover up the assault because she was embarrassed and ashamed, perhaps in part because Rosky was a much older man. Moreover, C.J.'s visit with Dr. Rooney came at a time when she was still denying any sexual contact with Rosky to the police. It is therefore perfectly consistent that she would also deny the assault to Dr. Rooney. Second, that C.J. spoke to her doctor about her sexual activity in no way proves that she was "not too embarrassed to inform anyone of the sexual assault"; what someone feels comfortable discussing with her doctor is no indication of what she would feel comfortable discussing outside the doctor's office, including with police. Third, whatever C.J.'s grandmother believed regarding the charges the police might bring against Rosky is immaterial. Finally, nothing in the medical report establishes that Rosky was C.J.'s confidant. That allegation is based on Rosky's own memory that C.J. told him about visiting the doctor. (ECF No. 2 at 88-90.) Petitioner's own self-serving statements are inherently unreliable and therefore cannot establish actual innocence.

At base, Rosky is arguing that the medical report shows that C.J. was inconsistent in her story, undermining her credibility. However, the inconsistencies and changes in C.J.'s story were thoroughly examined at trial. The Court cannot conclude that, presented with this evidence and in light of all the other evidence presented at trial, no reasonable juror would have found Rosky guilty beyond a reasonable doubt. Accordingly, Rosky cannot pass through the *Schlup* gateway on the basis of Ground Seven.

In Ground Eight, Rosky asserts that that the medical report of C.J.'s SART (Sexual Assault Response Team) exam on February 28, 2000, shows he is actually innocent because C.J.'s statements therein contradict her statements to Dr. Rooney

///

and others, and because the report indicates no healing sexual assault injuries.[12] (ECF No. 2 at 92-94.) Specifically, Rosky asserts C.J. was inconsistent because she: (1) made no mention of her pregnancy scare and claimed regular menstrual cycles; (2) claimed the alleged assault was her only sexual experience, contrary to what she told Dr. Rooney; and (3) claimed the alleged assault happened after she turned 14 on January 12, 2000, which doesn't correspond to when she claims Rosky assaulted her.

Again, assuming this is new evidence, it does not show that Rosky is factually innocent. The lack of any healing sexual assault injuries does not establish that no sexual assault took place, particularly when the exam occurred nearly two months after the assault. And, as discussed above, C.J.'s inconsistent statements were thoroughly explored at trial, even if these specific inconsistencies were not discussed. While further evidence of C.J.'s prior inconsistent statements could have had some impact on the jury's assessment of C.J.'s credibility, the Court is not persuaded that no reasonable juror would have found Rosky guilty beyond a reasonable doubt had this evidence been presented at trial. Accordingly, the evidence in Ground Eight does not establish Rosky's innocence and does not provide a basis for passing through the *Schlup* gateway.

In Ground Nine, Rosky asserts that police reports[13] contained the following exculpatory information: (1) on January 25, 2000, C.J. made no complaint of assault and the report shows that the investigation was initiated by a third party, not C.J.; (2) on February 16, 2000, C.J. told the investigating officer that she and Rosky "just had regular sex," indicating a consensual relationship, and Tone noted that C.J. stated "it was not forced" and that she was in love with Rosky. (ECF No. 2 at 95.) Rosky further asserts that one of the reports indicates that the assault took place at his apartment

///

///

---

[12]The report is part of the state court record. (Exh. 28.)

[13]Rosky does not provide the reports or cite their location in the record. However, the Court has located numerous police reports in Exhibit 219, including those documenting C.J.'s interviews with officers on January 25, 2000, and February 16, 2000, and presumes these are the reports Rosky relies on.

during a party with C.J.'s friends and that C.J. stated she had left with her friends, but none of her friends were investigated. (*Id.*)

To the extent Rosky argues that the January 25, 2000, report provides reliable new evidence demonstrating his innocence, the report is essentially duplicative of evidence that was presented at trial and thus is not new. C.J. testified that she did not call police and that she initially denied the assault to Tone. (*See* Exh. 156 (Tr. 57, 80-81).) While Rosky's argument focuses instead on C.J.'s very first encounter with officers on January 25, 2000, as opposed to her interview with Tone on February 2, 2000, the fact she denied the assault on January 25, 2000, is not materially different from the fact she denied it on February 2, 2000.[14] Thus, even if this constituted new evidence, the Court is not persuaded that it would have changed the jury's verdict, much less made it more likely than not that *no* reasonable juror would have found Rosky guilty beyond a reasonable doubt.

C.J.'s statement to Tone on February 16, 2000, that she and Rosky "just had regular sex" is not demonstrative of Rosky's innocence. Nothing about that statement — alone or in context — suggests that the sex was consensual.[15]

As to Rosky's claim that C.J. stated that she was in love with Rosky, no such statement appears in Tone's police reports.[16] (*See* Exh. 219 at 32-49.) Tone's report does contain the language "it was not forced," but that language was used to describe what Officer Reid stated to Rosky during his interview. Specifically, Tone's report states:

[14]The Court notes that, had the contents of the January 25, 2000, report been admitted, they would likely have been more damaging than helpful to Rosky. The reports contained statements from C.J. and Middleton that Rosky stalked and threatened C.J., that Rosky had touched C.J. in inappropriate places and that C.J. was scared of him, and that Rosky had once told C.J. he wanted to teach her how to have sex. (ECF No. 24-8 at 11, 15 (Exh. 219).)

[15]Again, had the contents of the February 16, 2000, police report been admitted, they likely would have been more damaging than helpful to Rosky. The report contains C.J.'s statement that Rosky, repeatedly and progressively, tried to touch her in private places, without her consent. In addition, it notes that just before telling Tone about the assault, C.J. cried for a couple minutes, and when she finally spoke, she did so in a "whimpering voice." (*See* Exh. 219 at 32-49.)

[16]In fact, Tone's report notes that C.J. said she hated Rosky. (Exh. 219 at 44.)

"Reid told Rosky he does not believe Rosky forced her to have sex because of their relationship and that he cared for her, she cared for him, and things happened." (Exh. 219 at 66; *see also id.* at 29 (Reid reports that "I continued to tell [Rosky] that we knew the two of them had sex, it was a matter of us finding out if it was forced (it was not, according to C.J.) or was consensual . . .").) That C.J. ever told anyone the sex "was not forced" or that she cared for Rosky does not appear anywhere in the police reports. Reid himself never talked to C.J. (See Exh. 219; Exh. 248 (Tr. 197-200).) In fact, Reid's statement, and Tone's description thereof, were nothing more than summaries of what Reid told Rosky during his interview, and Reid has explained that he said these things to get Rosky talking and not because he necessarily believed them. (Exh. 248 (Tr. 197-200).) These statements thus do not prove Rosky is innocent.

Rosky's assertion regarding the failure to investigate C.J.'s friends is a nonstarter. Rosky asserts that because C.J. left with her friends, the assault could only have happened while they were there, and thus the fact no one heard or saw anything in his small apartment establishes his innocence. However, at trial, C.J.'s conflicting accounts were clearly laid out: She had first claimed to have left with her friends but later stated she had stayed behind. C.J. was not assaulted in the version of the story where she left with her friends. It was in the version where she stayed behind that the assault took place. The jury chose to believe C.J.'s testimony despite these conflicting stories, and accept her testimony that Rosky assaulted her. Rosky's argument in this regard is therefore unpersuasive.

In Ground Nine, Rosky also asserts that two witnesses — Middleton and Johnathan Mosbacher — can prove his innocence. (ECF No. 2 at 95-96.) Middleton and Mosbacher testified at Rosky's September 1, 2011, state postconviction evidentiary hearing that Rosky and C.J. were in a relationship and pursuing each other. (Exh. 248 (Tr. 134-74).) The Court first notes that the reliability of this evidence is somewhat suspect, as it came nearly 12 years after the event in question. Even if this were reliable evidence, however, it does not prove Rosky's innocence or have any bearing on

whether C.J. consented to sexual intercourse the night of December 31, 1999. Moreover, it does not significantly undermine C.J.'s credibility as it is nothing more than the observation of two third parties. Even if this evidence could have impacted the jury's evaluation of C.J.'s credibility, the testimony is not substantially different from the cumulative evidence of C.J.'s and Rosky's relationship that was presented at trial. From the evidence presented at trial, a juror could have concluded that Rosky and C.J. were in some type of relationship. The Court is thus not sanguine that the result would have been any different had this testimony been presented, much less that no reasonable juror could have convicted Rosky in light of it. Ground Nine thus does not provide a basis for passing through the *Schlup* gateway.

None of the evidence Rosky cites disproves C.J.'s claim that Rosky forced her to have sex, and to the extent it may arguably be said to undermine C.J.'s credibility, it does not do so significantly. Evidence of C.J.'s different stories and the nature of her relationship with Rosky were thoroughly explored at trial, and the jury still found Rosky guilty of sexual assault beyond a reasonable doubt. Even if all the above evidence had presented at trial, the Court is not persuaded that no reasonable juror would have voted to convict. Accordingly, Rosky has failed to satisfy the standard for establishing a gateway claim of actual innocence, and his petition cannot therefore be considered timely on that basis.

### B.    Equitable Tolling

Rosky asserts two bases for equitable tolling. First, he asserts that the limitations period should be tolled for the 13-month period during which his first federal court petition was pending before it was dismissed. Second, he asserts that his state court attorney abandoned him during state court proceedings because she refused to assert his double jeopardy claim in his state petition and never notified him that the Nevada Supreme Court had decided the appeal of the denial of his first state habeas petition. (ECF No. 2 at 17-26.)

///

Equitable tolling is appropriate only if the petitioner can show that: (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 649 (2010). Equitable tolling is "unavailable in most cases," *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999), and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule," *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002) (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000)). The petitioner ultimately has the burden of proof on this "extraordinary exclusion." 292 F.3d at 1065. He accordingly must demonstrate a causal relationship between the extraordinary circumstance and the lateness of his filing. *E.g., Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003). *Accord Bryant v. Arizona Attorney General*, 499 F.3d 1056, 1061 (9th Cir. 2007).

Rosky's petition was filed twenty months after the limitations period expired. Thus, in order for the petition to be considered timely in this case, Rosky must establish equitable tolling for that amount of time.

The length of time the court took to decide Rosky's first, completely unexhausted federal petition does not provide a basis for equitable tolling. While the time it took for the court to dismiss Rosky's first petition was out of his control, it was not an extraordinary circumstance. There has been no allegation that the court's dismissal of the petition was unjustified, nor could such a viable argument be made. *See Carjasso v. Ayers*, 278 F.3d 874 (9th Cir. 2002). Rosky is not entitled to equitable tolling while his first federal petition was pending.[17]

---

[17]Even if the Court were inclined to find the petition timely based, in part, on equitable tolling of this time period, the only claim that should receive the benefit of tolling would be the single claim raised in the first federal petition: that Rosky's conviction violated double jeopardy. This claim is patently without merit, and thus Rosky would not be afforded relief, at any rate. *See United States v. Jose*, 425 F.3d 1237, 1240-41 (9th Cir. 2005) (citing *Ball v. United States*, 163 U.S. 662, 671-72 (1896)) (jeopardy continues after reversal of conviction on appeal). Although Rosky asserts that his sexual assault conviction was reversed after his first trial on the basis of insufficient evidence, which could state a double jeopardy claim, that is not in fact what happened. Instead, the Nevada Supreme Court noted that the sexual assault conviction was not
*(fn. cont...)*

18

Rosky's second tolling argument is that his counsel abandoned him during state postconviction proceedings. Abandonment by counsel can be a basis for equitable tolling. *See Gibbs v. LeGrand*, 767 F.3d 879, 887 (9th Cir. 2014). Rosky argues, first, that counsel abandoned him by refusing to raise a double jeopardy claim. In the context of this case, counsel's conduct hardly amounts to abandonment. Rosky claims that on February 24, 2013, he wrote to counsel asking her to assert a double jeopardy claim. However, by this time the state trial court had already decided his first state habeas petition and his appeal thereof had been pending before the Nevada Supreme Court for nearly ten months, fully briefed for more than two. Counsel's refusal to amend a petition that was already on appeal — particularly with a meritless claim, which Rosky's double jeopardy argument is — did not constitute abandonment. Nor was counsel's failure to file a motion for reconsideration or for en banc rehearing after the Supreme Court's decision on his postconviction appeal abandonment. Rosky does not allege that he failed to file a timely petition because he believed counsel was taking steps that she was not in fact taking. In point of fact, counsel told Rosky that she would not be filing any more documents in his case. Accordingly, petitioner cannot establish a basis for equitable tolling based on counsel's failure to raise his double jeopardy claim in state court.

Rosky's second assertion of abandonment — that counsel never notified him that the Supreme Court had decided his first petition — is a closer question. (ECF No. 2 at 24.) Rosky argues that he learned about the decision only from prison law library staff, though he does not identify when he learned about it. Rosky filed a federal habeas petition in September 2013, but did not reference his state postconviction proceeding therein, so it is unclear whether he was aware of Nevada Supreme Court's decision at that time. (ECF No. 1 in Case No. 2:13-cv-1707-JCM-PAL.) However, the court's May

---

*(…fn. cont.)*

supported by overwhelming evidence in connection with deciding whether the improper introduction of prior bad act evidence was harmless. (*See* Exh. 128.) Rosky's double jeopardy claim is therefore without merit.

30, 2014, order to show cause in the first federal action noted the Nevada Supreme Court's decision on Rosky's postconviction appeal. (ECF No. 8 in Case No. 2:13-cv-1707-JCM-PAL). Rosky dispatched an amended petition in accordance with the order to show cause on June 12, 2014, demonstrating that he both received and understood the court's order. (ECF No. 9 in Case No. 2:13-cv-1707-JCM-PAL). Thus, even assuming counsel never told Rosky about the decision in his postconviction appeal, Rosky knew about the decision by June 12, 2014, at the latest and therefore would not be entitled to tolling past that point. And even if the clock were tolled until June 12, 2014, the petition in this case, filed on March 7, 2016, would still be untimely.

As the petition in this case was not timely filed, it will be dismissed with prejudice for failure to file the petition within the one-year limitation period in 28 U.S.C. § 2244(d).

## III. CERTIFICATE OF APPEALABILITY

In order to proceed with an appeal, Rosky must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski,* 435 F.3d 946, 950-951 (9th Cir. 2006); s*ee also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Id.;* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.* When the petitioner's claim is denied on procedural grounds, a certificate of appealability should issue if the petitioner shows: (1) "that jurists of reasons would find it debatable whether the petition states a valid claim of the denial of a constitutional right"; and (2) "that jurists of reason would find it debatable
///

whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).

Reasonable jurists would not find this Court's dismissal of the petition as untimely to be wrong or debatable. Rosky has not established or argued any basis for equitable tolling that would make the instant petition timely. Nor has he established that he is actually innocent. The *Schlup* standard is demanding and is one that is rarely met. Rosky has not come forward with any new, reliable evidence establishing that it is more likely than not that no reasonable juror would have voted to find him guilty of sexual assault. Accordingly, the Court concludes that Roksy has not satisfied the standard for issuance of a certificate of appealability.

**IV.     CONCLUSION**

In accordance with the foregoing, it therefore is ordered that the petition in this case will be dismissed with prejudice as untimely.

It further is ordered that the Court denies a certificate of appealability, as reasonable jurists would not find the district court's dismissal of the petition as untimely to be wrong or debatable, for the reasons discussed herein.

It is further ordered that the Clerk of Court enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED THIS 19th day of March 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE